1
2
3
4

**UNITED STATES DISTRICT COURT**

5

**DISTRICT OF NEVADA**

6
7

SUZANNE G. SMITH,                    )
                                     )
8                           Plaintiff,    )        Case No. 2:16-cv-01284-JAD-GWF
                                     )
9     vs.                            )        **REPORT AND**
                                     )        **RECOMMENDATION**
10    NANCY A. BERRYHILL,            )
      Commissioner of Social Security,    )
11                                   )        Motion for Reversal and/or Remand (#18)
                            Defendant.    )     Cross-Motion to Affirm (#21)
12    _____ )

13          This case involves judicial review of administrative action by the Commissioner of Social

14    Security denying Plaintiff Suzanne Smith's claim for disability benefits under Title II of the Social

15    Security Act.  Plaintiff's Complaint (ECF No. 4) was filed June 10, 2016.  Defendant's Answer (ECF

16    No. 14) was filed October 12, 2016.  A certified copy of the Administrative Record (the "AR") was

17    filed on October 20, 2016.  *See* (ECF No. 17).  This matter has been submitted to the undersigned

18    United States Magistrate Judge for Findings and Recommendations on Plaintiff's Motion to Remand

19    (ECF No. 18), filed on November 11, 2016 and the Commissioner's Cross-Motion to Affirm and

20    Opposition to Plaintiff's Motion for Reversal and/or Remand (ECF No. 21), filed on January 12, 2017.

21    Plaintiff did not file a reply.

22                                **BACKGROUND**

23    **A.      Procedural History.**

24          On October 31, 2011, Plaintiff filed a Title II application for a period of disability and disability

25    insurance benefits as well as a Title XVI application for supplemental security income.  AR 14.

26    Initially, Plaintiff alleged that her disability began on January 31, 2009 but later amended that date to

27    November 2, 2011.  AR 210-211.  The Social Security Administration denied Plaintiff's claim on

28    February 21, 2012.  AR 67-74.  Plaintiff then filed for reconsideration, AR 124-125, which was denied

on May 23, 2013.  AR 126-133.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), AR 134-135, and testified at a hearing before the ALJ on June 17, 2014.  AR 32-66.  The ALJ determined that Plaintiff was not disabled from November 2, 2011 through March 31, 2013, Plaintiff's date last insured.  AR 19-24.  Plaintiff appealed the decision of the ALJ to the Appeals Council on September 19, 2014.  AR 9-10.  The Appeals Council denied Plaintiff's request for review on April 6, 2016.  AR 1-6.  Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).

### B.    Factual Background.

Plaintiff Suzanne Smith was born on October 5, 1965.  AR 212.  She is 5 feet tall and weighed 224 pounds in November 2011.  AR 216.  Plaintiff obtained a GED in June 2011 and completed vocational rehabilitation training in January 2008.  AR 217.  She was single and lived in an apartment.  AR 37.  Plaintiff was incarcerated from 2009 to 2011 for possession of stolen property and uttering a forged document.  AR 37-38.  Prior to that she was incarcerated for two charges of domestic battery.  AR 38.

### 1. Plaintiff's Disability/Work History Reports and Hearing Testimony.

In her initial November 2011 disability report, Plaintiff listed the following as her disabling conditions: depression, bipolar disorder, and schizophrenia.  AR 216.  She reported that she stopped working on October 3, 2011 because of her conditions.  She previously worked as a dishwasher and sales associate.  AR 217.  Plaintiff stated that she was treated by Dr. Tigel in October 2011 and was taking cogentin and seroquel for her conditions.  AR 219-220.

Plaintiff submitted a function report in November 2011.  She stated that she had short term memory loss that made it hard to concentrate and remember things.  She had paranoid episodes when out in public, which made her not want to go out.  AR 222.  On some days, she had a hard time getting out of bed and would feel worthless and cry.  She usually stayed home and watched TV or went to doctor appointments with her fiancé.  AR 223.  Plaintiff could clean her apartment, do laundry and sometimes cook when she felt able.  Before her injuries, she was able to work outside the home and remember daily tasks.  If she did not take her medication, she would not sleep well because she would hear voices. AR 223.  She needed reminders to take medications and encouragement to complete daily tasks.  AR 224.

1       Plaintiff stated that she only went out of the house about twice a week to go to church or the

2  grocery store. AR 225. She felt that people stared at her and this made her feel paranoid and unsafe.

3  AR 225. Plaintiff's fiancé helped her pay bills because she could not manage her checkings and

4  savings accounts well. She became easily frustrated when dealing with other people and was easily

5  sidetracked when she would hear things that weren't there. AR 227. Plaintiff could walk a block or

6  two. She could pay attention for "30 minutes or so," and could sometimes follow written instructions.

7  She needed to have oral instructions continually repeated. AR 227. She was fired or laid off from her

8  job as a dishwasher and sales associate at 7-11. AR 228. Plaintiff took seroquel and cogentin for her

9  conditions. She stated that she could not properly function without the medication. AR 229. Even

10  when taking her medication, however, she experienced high anxiety which made her dysfunctional.

11       Plaintiff submitted a second disability report in March 2012. She reported that she had gained

12  weight since her last report and had been having hallucinations during the day and at night. AR 240.

13  She had difficulty going out in public or riding the bus because of her hallucinations. AR 242. She had

14  seen Dr. Figueroa for a blood test, and was taking the same medications. AR 242. No other changes

15  were noted. Plaintiff submitted a third disability report in July 2013. She reported swelling in her legs

16  and had to increase her medication. AR 247. She had anxiety attacks and avoided crowds. Plaintiff

17  reported treating at Southern Nevada Adult Mental Health Services for her depression and paranoid

18  episodes. AR 248. She was taking the following medications: benztropine, clonidine, famotifine, lasix,

19  latuda, lyrixa, paroxetine, paxil, seroquel and surosemide. AR 249. Plaintiff stated that in addition to

20  panic attacks, she could no longer write anything because her thumb locked up and pain would shoot up

21  her arm and into her neck. She did not drive an automobile. She also needed help getting into the

22  bathtub because she could not lift her legs due to swelling. AR 250.

23       Plaintiff testified at the June 17, 2014 hearing that she worked for AGR Group of Nevada from

24  August 2012 through December 2012 doing sales calls and then monitoring other outgoing phone calls.

25  AR 38. She also worked at QM Corporation in 2003 and 2004 doing phone sales. AR 39. Plaintiff

26  described her back problems and stated that when she stood or sat too long her thighs would go numb

27  and she would have pain in her hips and knee. AR 41. She applied heat and ice to help the pain, but it

28  only worked for short periods of time. She could walk for two blocks at a time but had to use her

inhaler because she got winded. She could stand for 10-15 minutes before her legs would go numb, especially her right side. She could sit for about 30 minutes at a time. AR 42.

Plaintiff testified that she had been diagnosed with COPD in December 2013 and had since quit smoking. AR 42. She had difficulty using her right hand due to nerve damage and carpal tunnel in the wrist. AR 43. She continued to suffer from anxiety, depression and bipolar disorder, but testified that she did okay with her medication and adjustments. She still had difficulty dealing with people because of her anxiety. She had difficulty concentrating, and still experienced auditory and visual hallucinations, but not as often since being placed on medication. AR 43-44. Plaintiff had taken seroquel since September or October 2011. She testified that it was effective at minimizing the occurrence of hallucinations. AR 44.

Plaintiff testified that even with her current medication she would not be able to perform her prior job as a sales associate because of her fear of rejection and that she would become depressed. AR 45. She testified, however, that she did not have difficulty getting along with other people. She only had difficulty getting along with coworkers who made fun of her. AR 46. Plaintiff testified that since leaving prison, her mental health had stabilized, but her physical health had deteriorated. AR 46-47. Prior to going to prison, she consumed alcohol, nonprescription pills, and methamphetamine. AR 48-49. Plaintiff testified that her driver's license expired while she was in prison and she had not obtained another one. AR 47. She enjoyed reading books that made her laugh. AR 47-48. She cooked and cleaned for herself, and did her own laundry and grocery shopping. During a typical day, she would stay home unless the ladies from her church picked her up. AR 49. If picked up, she would go to church services or help out with various charities or programs offered through the church. AR 50.

Under questioning by her attorney, Plaintiff testified that she could not work because she could no longer function in society. AR 51. Her medications made her tired and she would nap two to three times a day. She could not sleep through the night because she heard voices that disturbed her and she worried a lot. AR 53. Her most comfortable position was laying flat on her back with her legs up because of the pain in her right knee and lower back. She would have to be in that position for six to seven hours during a 24 hour day, or for two to four hours during an eight-hour day. AR 54. Plaintiff testified that she had difficulty remembering what she read and what she watched on TV. AR 55-56.

She isolated herself and was depressed a lot because she worried about her daughter.  AR 56.  On her good days, Plaintiff would listen to music, do house work and open the curtains.  AR 57.  On bad days, she kept her home dark, and did not get dressed or take a shower.  The bad days could last one day or more.  AR 58.  She further described a bad day as one in which no one called her, she had no energy, her legs hurt, her body ached and she felt depressed.  AR 59.  Plaintiff testified that she would have about three bad days per week.  She saw her psychologist once a week.  AR 60.

### 2. Vocational Expert's Testimony

The ALJ asked the Vocational Expert ("VE"), Kenneth Lister, to assume the following hypothetical individual:

> For my first hypothetical, I would like you to assume an individual between the ages of 43 and 47 years old with a high school education and no past relevant work. The individual would be able to perform work at the sedentary exertional level with the following limitations: The individual could occasionally use her right lower extremity to operate foot controls.  The individual could occasionally climb ramps or stairs, occasionally balance, occasionally stoop and could tolerate occasional exposure to hazards.
>
> The individual would be unable to climb ladders, ropes or scaffolds, unable to kneel, unable to crouch and unable to crawl.  The individual could perform simple, routine, repetitive tasks for two-hour periods.  The individual could occasionally interact with coworkers and supervisors and the general public, and, finally, the individual could adapt to routine work changes.  With those limitations, would there by any jobs the individual could perform in the national economy?[1]

AR 61-62.

The VE testified that the hypothetical individual could perform the following jobs: (1) final assembler in the optical industry, DOT Code 713.687-018, sedentary in exertional level and occurs in the national economy at approximately 35,000 jobs; (2) dowel inspector, DOT Code 669.687-014, sedentary in exertional level and occurs in the national economy at approximately 23,000 jobs; and (3) semi-conductor bonder, DOT Code 726.685-066, sedentary in exertional level and exists in the national economy at about 2,140 jobs.  AR 62-63.

---

[1]The ALJ did not consider Plaintiff to have past relevant work, and therefore evaluated her ability to work at step five of the sequential process.  AR 24-25, 62 .

The ALJ then added two additional limitations to the hypothetical person:

> The individual would be expected to be off task up to 20 percent of the time, such that one out of five tasks would be done incorrectly, and the individual could be expected to be absent from work, approximately, one time per week or three to four times per month. With either of those limitations, could such an individual perform the jobs you previous [sic] identified?

AR 63-64.

The VE testified that either of these additional limitations would preclude the ability to work. He based this opinion on his experience as a vocational counselor in Utah in which he found that being off task 15 percent of the time, or absent from work twice per month were the maximum most employers would allow.

### 3. Medical Records and Reports

Plaintiff underwent a psychiatric evaluation on October 17, 2011 by Dr. Phillip Tigel at the Southern Nevada Adult Mental Health Services ("SNAMHS"). AR 299-305. Plaintiff reported that she had been treated for severe depression and borderline bipolar with psychotic tendencies in the past. AR 299. She had hallucinations and always felt as if people were watching her. She did not have suicidal ideations and was at a low risk of suicide. AR 301-302. Dr. Tigel noted that Plaintiff was cooperative, made good eye contact and behaved appropriately. AR 303. She was observed to be tearful at times and her mood was "anxious, depressed feeling." Her concentration was okay and she had an average intellectual function. Dr. Tigel diagnosed Plaintiff with psychotic disorder, polysubstance dependence, depressive disorder, personality disorder and obesity. AR 304. The following comments were made on the diagnosis: "Possible psychotic depression but A/H are not consistent with that. Possibly related to Axis II issues. Doubt bipolar d/o." AR 304. Plaintiff was prescribed seroquel. AR 305.

Plaintiff returned for a follow-up visit on October 31, 2011. She felt pretty good and was getting more sleep when she took a higher dose of her medication. AR 309. However, she continued to have feelings of guilt, hopelessness, and worthlessness. She also complained of nose bleeds. Dr. Tigel noted that there was no gross evidence of psychotic thinking during the examination. AR 309. Plaintiff was prescribed a trial of cogentin in addition to seroquel and was to return for follow-ups. AR 310. Plaintiff returned on November 28, 2011. She reported that she was uncomfortable in public, felt

1  depressed most of the time, cried a lot in the daytime, but slept better and had less hallucinations since

2  taking seroquel.  AR 307.  Her cognitive functioning was grossly intact but her mood was depressed.

3  Dr. Tigel found that Plaintiff was stable and partially responded to treatment.  He increased her

4  medication and prescribed paxil.  AR 308.

5      Plaintiff returned on December 23, 2011.  She denied hallucinations and hearing voices.  AR

6  331.  Her mood was good and she reported sleeping 6 hours per night.  She stated that her pain was a 0

7  out of 10.  She received prescription refills and was otherwise found to be stable.  Plaintiff reported that

8  she was doing "ok" on February 17, 2012.  She still suffered from paranoia but not as badly; was still

9  anxious and cried easily, but was better; had not heard voices in 1-2 months; and was still

10  uncomfortable on public transportation.  AR 329.  Dr. Tigel found her to be stable, responding partly to

11  treatment, and adjusted her medications.  AR 330.  On July 9, 2012, Plaintiff reported having high

12  anxiety and depression due to her boyfriend leaving her.  She was having a hard time concentrating, and

13  was hearing voices at night.  AR 353.  She reported using methamphetamine in June 2012 and using

14  marijuana nightly since May 2012.  She was diagnosed with psychotic disorder, anxiety disorder,

15  polysubstance dependence and depressive disorder.  AR 353.  She was advised to discontinue taking

16  seroquel due to weight gain and to also discontinue paxil.  AR 353-354.  She was continued on latuda,

17  clonidine, and cogentin.  AR 354.  Plaintiff reported feeling stable on her medications and endorsed a

18  stable mood on August 12, 2012.  AR 338.  She stated her anxiety issues come from "family problems,"

19  but denied current issues with psychosis/paranoia.  She heard voices while sleeping.  Dr. Tigel

20  diagnosed Plaintiff as having a major depressive disorder and amphetamine dependence.  AR 342.  He

21  continued her on seroquel, paxil, and latuda.  AR 323.

22      On December 21, 2012, Plaintiff reported that she had just been laid off from her job and was

23  depressed because of the holidays.  AR 357.  She had difficulty falling asleep and had poor energy and

24  motivation.  Plaintiff was found to be fairly stable and responded to treatment.  She was prescribed

25  paxil, seroquel, cogentin, latuda and clonidine.  AR 358.  Plaintiff was again found to be stable in

26  January 2013.  AR 355-356.  Plaintiff returned to SNAMHS on February 4, 2014.  Her chief concern

27  was not having her medication because she did not do well without it.  AR 387.  She presented with

28  symptoms of depression, low motivation, paranoia, anxiety and insomnia that made her resume

7

1   treatment.  She reported doing well when on her medication and wanted to continue with the same
2   medications.  AR 388.  Plaintiff was diagnosed with bipolar II disorder, psychotic disorder,
3   polysubstance dependence, hypertension and obesity.  AR 393.  She was prescribed clonidine,
4   paroxetine, latuda, seroquel, and cogentin.  AR 395.  Plaintiff returned for a medication refill on April
5   16, 2014.  AR 385.  She reported doing well and stated that the occasional voices were manageable.

6   From June 8, 2012 through April 24, 2013, Plaintiff was treated at Northern Nevada Adult
7   Mental Health Services ("NNAMHS").  She received counseling to help with her recovery from
8   methamphetamine use and to deal with her mental disorders.  Her complaints, diagnoses, and treatment
9   while at NNAMHS were largely the same as those at SNAMHS.  AR 415-424.

10  Plaintiff was treated at University Medical Center of Southern Nevada ("UMC") from
11  September 11, 2012 through March 25, 2014.  During her initial visit on September 11, 2012, Plaintiff
12  was diagnosed or noted to have a history of gastroesophageal reflux disease, hyperuricemia,
13  hypertension, dyslipidemia, schizophrenia and bipolar disease secondary to chronic use of
14  methamphetamine, bilateral dependent edema, chronic right knee and right shoulder pain, and
15  bronchitis.  AR 449.  Her prior medications were refilled and she was prescribed a z-pak for her
16  bronchitis.  The only other treatment record was dated March 25, 2014.  Plaintiff was seen for a follow-
17  up and it was noted that she was "totally disabled due to her history of schizophrenia."  AR 435.  It also
18  stated that Plaintiff had been "totally off amphetamines for the last 10 years."  She was diagnosed or
19  noted to have a history of schizophrenia, bipolar disorder, depression, morbid obesity, arthritis in
20  bilateral knees and shoulders, tobacco use, gastroesophageal reflux, hyperuricemia, and dyslipidemia.
21  AR 435.  Plaintiff was prescribed Chantix to help her quit smoking, lipitor for her dyslipidemia and
22  motrin for pain.  AR 436.

23  At the request of the Bureau of Disability Adjudication, Plaintiff was examined by David
24  Mumford, M.D. on March 26, 2013.  Plaintiff reported to Dr. Mumford that she had low back and joint
25  pain.  AR 365.  He noted that she was a "morbidly obese female who is credible, with excellent
26  cooperation, and friendly throughout the examination."  AR 366.  Dr. Mumford found no objective
27  evidence of any mechanical problem affecting the lumbar spine.  Plaintiff had a full range of motion
28  and there was no evidence of radiculopathy.  AR 368.  A lumbar x-ray showed degenerative disease at

8

L5-S1.  AR 372.  Dr. Mumford diagnosed Plaintiff with chronic low back pain due to degenerative disease of the lumbar spine.  He also diagnosed multiple arthralgias associated with moderate degenerative joint disease of the right knee.  AR 369, 374.

Dr. Mumford stated that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently.  She was able to stand and/or walk for 2 hours in an 8 hour workday without the need for an assistive device.  AR 369.  There were no restrictions on her ability to sit.  Standard breaks and a lunch period would provide sufficient time for Plaintiff to alternate between sitting and standing.  She could occasionally climb ramps/stairs, never climb ladders/scaffolds, kneel, crouch/squat or crawl, and had no restrictions when balancing or stooping/bending.  AR 369.  She could not work at heights or with moving machinery.  AR 370.  No other restrictions or limitations were noted.

On January 1, 2014, E.C. Rucker, M.D., submitted a Clark County Social Service Medical/Service Provider Assessment Form on Plaintiff's behalf.  AR 376.  He diagnosed her as suffering from schizophrenia, bipolar disorder, and severe depression.  He stated that her prognosis was "poor to return to work due to mental health" and "arthritis in knees."  Plaintiff was to continue seeing a mental health professional and continue on her medication regimen.  AR 376.  Dr. Rucker opined that Plaintiff was totally disabled and that her limitations would continue for over one year.

**C.    ALJ's Decision.**

The ALJ stated in his September 2, 2014 decision that Plaintiff had the residual functional capacity ("RFC") to perform work at the sedentary level as defined in the Dictionary of Occupational Titles and the Social Security Regulations, and therefore was not disabled between her alleged onset date of November 2, 2011 and her last date insured, March 31, 2013.  AR 14-26.  The ALJ applied the five-step process set forth in 20 C.F.R. § 404.1520(a)-(f).  He first found that Plaintiff had not engaged in substantial gainful activity since November 2, 2011.  AR 16.  Second, he found that she had the following severe impairments: obesity, degenerative disc disease of the lumbar spine, degenerative joint disease of the right knee, schizophrenia and bipolar disorder.  AR 17.  He stated that depression, anxiety or psychotic disorder were considered under the diagnoses of schizophrenia and/or bipolar disorder.  The ALJ also found that Plaintiff suffered from the following nonsevere medical impairments:  COPD, right carpal tunnel syndrome, intermittent right shoulder pain complaints and/or osteoarthritis/multiple

arthralgia. AR 17. He stated that there was little indication that these conditions had any significant affect on Plaintiff's ability to perform basic work activities. Third, the ALJ found that Plaintiff's impairments did not meet and were not medically equivalent to any condition listed in Appendix 1, Subpart P, of 20 C.R.F. § § 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. AR 18.

Prior to step four of the analysis, the ALJ found that Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except that she was able to occasionally use her right lower extremity to operate foot controls; occasionally climb ramps or stair, balance, stoop, and tolerate exposure to workplace hazards. She was unable to kneel, crouch, crawl, or climb ladders, ropes, or scaffolds. Mentally, she was able to perform simple, routine tasks for 2-hour periods over the course of a workday and workweek. She was able to interact occasionally with coworkers, supervisors, and the general public, and adapt to routine work changes. AR 20. In arriving at this RFC determination, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some symptoms, but her statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. In regard to her degenerative disc disease of the lumbar spine and degenerative joint disease, the ALJ stated that there were limited documented complaints regarding these conditions and the physical examination findings were largely unremarkable. AR 21.

The ALJ also noted that Dr. Mumford's March 2013 examination findings were largely unremarkable. Plaintiff was unable to sit up from a lying position with legs extended due to body habitus, but was otherwise able to move about normally. The ALJ also noted that Mayenne Karelitz, M.D., the state agency medical consultant, opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, could stand and/or walk for 2 hours in an 8-hour workday, could sit for 6 hours in an 8 hour workday, could occasionally use her right lower extremity, could occasionally climb ramps and stairs, balance, and stoop, could not climb ladders, ropes or scaffolds, and could not kneel, crouch or crawl. AR 22. The ALJ afforded the opinions of these doctors "partial weight" because they were generally consistent with the medical record as a whole. He stated, that the record indicated "somewhat more significant limitations than that provided by Dr. Karelitz, and even

more so than that provided by Dr. Mumford, particularly in regards to the right lower extremity." AR 22.

Next, the ALJ discussed Plaintiff's schizophrenia and bipolar disorder. He stated that her documented complaints had been intermittent and largely situational. The overall treatment for these impairments had been routine and conservative, and Plaintiff generally responded well to her medications. AR 22. The ALJ afforded Dr. Rucker's opinion that Plaintiff was totally disabled "little weight." The ALJ noted that he was a medical doctor, not a mental healthcare provider, and provided only limited treatment to Plaintiff. The ALJ also stated that Dr. Rucker's opinion was conclusory and not supported by the record as a whole. AR 23. The ALJ stated that the state agency psychological consultant, Pastora Roldan, Ph.D., found that there was insufficient evidence of any severe mental impairment. AR 23. He ultimately afforded Dr. Roldan's opinion "no weight" because there was sufficient evidence in the record to find that Plaintiff had a severe mental impairment, but that there was not enough evidence to support her allegations of disabling limitations. AR 23.

The ALJ found that Plaintiff's activities of daily living did not support her allegations of disabling limitations. She had no problems with personal care, could prepare simple meals and could use public transportation. AR 24. She went to church several times a week and admitted that she engaged in a range of activities around the house. Plaintiff got along with family and friends and belonged to clubs within her church. Plaintiff also worked after her alleged disability onset date and the only reason she stopped working was because she was laid off. AR 24.

The ALJ concluded at step five that Plaintiff was able to perform jobs that existed in significant numbers in the national economy. AR 24-25. Based on the vocational expert's testimony, he specifically found that she could work as a final assembler; dowel inspector, and semiconductor bonder. She was therefore not disabled within the meaning of the Social Security Act. AR 25.

## DISCUSSION

### I.    Standard of Review.

A federal court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841,

846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both adverse and supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision.  *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision.  *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings.  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)).  In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based."  *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In the alternative, the District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  *Id.*

. . .

. . .

12

1

## II.    Disability Evaluation Process

2        To qualify for disability benefits under the Social Security Act, a claimant must show (a) that

3    she suffers from a medically determinable physical or mental impairment that can be expected to result

4    in death or that has lasted or can be expected to last for a continuous period of not less that twelve

5    months; and (b) that the impairment renders her incapable of performing the work that she previously

6    performed and incapable of performing any other substantial gainful employment that exists in the

7    national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. §

8    423(d)(2)(A).  The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d

9    179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  If the claimant establishes an inability to

10   perform her prior work, the burden shifts to the Commissioner to show that the claimant can perform a

11   significant number of other jobs that exist in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071,

12   1074-75 (9th Cir. 2007).  Social Security disability claims are evaluated under a five-step sequential

13   evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th

14   Cir. 2001).  The claimant carries the burden with respect to steps one through four. *Tackett v. Apfel*,

15   180 F.3d 1094, 1098 (9th Cir. 1999).  The sequential evaluation process is accurately set forth in the

16   ALJ's decision, AR 15-16, and will not be repeated here.

17       ## III.    Analysis and Findings

18       Plaintiff's sole argument for reversal is that the ALJ did not adequately develop the record

19   regarding the extent of her mental impairment and its affect on her ability to work.  Based on the record

20   as a whole, however, the Court finds the ALJ's decision is supported by substantial evidence and that

21   he did not commit legal error.

22       The ALJ has "a special duty to develop the record fully and fairly and to ensure that the

23   claimant's interests are considered." *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001) (*citing*

24   *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001)).  The ALJ's duty to develop the record fully

25   is heightened where the claimant may be mentally ill and thus unable to protect her own interests.

26   *Higbee v. Sullivan*, 975 F.2d 558, 562 (9th Cir.1992).  Although the ALJ's duty to develop the record

27   exists even when the claimant is represented by counsel, *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th

28   Cir. 1991) (citing *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)), the Commissioner argues that

1   claimant's counsel has a duty to raise all relevant issues and evidence at the administrative hearing to

2   preserve them for appeal. *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999); *Gutierrez v. Comm'r*

3   *of Soc. Sec.*, 740 F.3d 519, 527 (9th Cir. 2014). *Meanel*, however, has been called into doubt by *Sims v.*

4   *Apfel*, 530 U.S. 103, 112, 120 S.Ct. 2080 (2000), in which the Supreme Court held that because

5   Appeals Council has the primary responsibility for identifying and developing the issues, the claimant

6   can raise issues for the first time on judicial review. In any event, because the claimant bears the

7   burden of proving disability, the ALJ's duty to further develop the record is "triggered only when there

8   is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."

9   *Tonapetyan*, 242 F.3d at 1150.

10          Plaintiff argues that the ALJ should have obtained an assessment by a psychiatrist or

11  psychologist regarding Plaintiff mental functional capacity. She argues that the ALJ was not qualified

12  to render an expert mental health opinion. She also asserts that a mental functional assessment by a

13  qualified psychiatrist or psychologist was necessary because the ALJ rejected the only

14  medical/psychological opinions that addressed Plaintiff's mental impairments. Plaintiff argues that Dr.

15  Roldan found that there was "insufficient evidence" in the record to determine whether Plaintiff's

16  mental impairments caused any functional restrictions as of May 23, 2013 (the date of the

17  reconsideration disability determination). The Commissioner argues that the ALJ's residual functional

18  capacity assessment regarding Plaintiff's mental impairment is supported by the record as a whole and

19  is, therefore, free from error. She argues that an ALJ makes an RFC determination based on all the

20  relevant evidence in the record, including medical source statements, medical signs, effects of

21  treatment, daily activities, effects of symptoms and recorded observations. The Commissioner argues

22  that the ALJ was under no duty to obtain an additional functional assessment because the record before

23  him was sufficient. The Commissioner also asserts that Plaintiff's argument is based on a lack of

24  understanding of how the State agency doctors review the evidence and make findings as to the severity

25  of impairments. The Commissioner asserts that Dr. Roldan's statement that there was "insufficient

26  evidence" of restrictions in mental functioning equates to a finding that Plaintiff did not suffer from a

27  severe mental impairment based on the medical records provided at the time of the reconsideration

28  decision. It did not mean that Dr. Roldan needed additional medical records to make that *any*

1    determination relating to Plaintiff's mental impairments.

2          The Court agrees with the Commissioner that the ALJ did not err by failing to adequately

3    develop the record.  The crux of Plaintiff's argument is that Dr. Roldan found that there was

4    "insufficient evidence" to support a finding that Plaintiff had a severe mental impairment and functional

5    restrictions resulting therefrom.  Dr. Roldan's determination was dated May 23, 2013.  After that date,

6    Plaintiff submitted additional medical and mental health evidence, including Dr. Rucker's opinion, that

7    the ALJ considered in making his RFC assessment.  This additional medical evidence, along with the

8    other evidence in the record, including Plaintiff's testimony, provided a sufficient evidentiary basis for

9    the ALJ to make an RFC assessment and conclude that Plaintiff's schizophrenia and bipolar disorder

10   did not prevent her from being able to perform sedentary jobs, as evidenced by her ability to perform

11   activities of daily living and to participate in church activities.  The ALJ made no finding that the

12   evidence before him was ambiguous.  Nor did it require a finding of ambiguity.  There was substantial

13   evidence in the record to support the ALJ's determination that Plaintiff had the residual functional

14   capacity to perform sedentary work, with some limitations, and was able to perform the jobs identified

15   by the vocational expert.  Accordingly,

16                              **RECOMMENDATION**

17          **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and Remand (ECF

18   No. 18) be **denied**, and that the Defendant's Cross Motion to Affirm (ECF No. 21) be **granted**.

19                                 **NOTICE**

20          Under Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing

21   and filed with the Clerk of the Court within fourteen (14) days.  Appeals may been waived due to the

22   failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  Failure

23   to file objections within the specified time or failure to properly address and brief the objectionable

24   . . .

25   . . .

26   . . .

27   . . .

28   . . .

1    issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of

2    the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United*

3    *Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

4          DATED this 29th day of March, 2018.

5

6

7                                        GEORGE FOLEY, JR.
                                        United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28